IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

BON VIVANT CATERING, INC. and
LAURA HALL,

               Plaintiffs,

    v.                                    1:13CV728

DUKE UNIVERSITY, et al.,

               Defendants.

MEMORANDUM OPINION, ORDER, AND RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE

This matter is before the Court on Defendant Duke University's First and Second Motions for Partial Summary Judgment [Docs. #134 and #150], and Plaintiffs Bon Vivant Catering, Inc. and Laura Hall's Motion for Summary Judgment [Doc. #148], Motion for Partial Summary Judgment on Affirmative Defenses [Doc. #146], and Motion to Exceed Page Limit [Doc. #174]. For the reasons that follow, the Court will recommend that both of Duke University's motions be denied, that Plaintiffs' Motion for Summary Judgment be denied, and that Plaintiffs' Motion for Partial Summary Judgment on Affirmative Defenses be granted in part and denied in part. Additionally, the Court will grant Plaintiffs' Motion to Exceed Page Limit.

I.     FACTS, CLAIMS, AND PROCEDURAL HISTORY

This matter involves a trademark infringement action in which Plaintiffs Laura Hall ("Ms. Hall") and Bon Vivant Catering, Inc. ("Bon Vivant") allege that Defendant Duke

University ("Duke") infringed Plaintiffs' federally-registered "Refectory Café" mark, U.S. Trademark Registration No. 4,249,970 [Doc. #69-2].

Bon Vivant, with Ms. Hall as majority shareholder and President, began operating the Refectory Café at Duke University Divinity School in 2005. (Operator's Agreement [Doc. #134-3]; Jones Decl. [Doc. #156-4] ¶ 8; Hall Aff. [Doc. #165-4] ¶¶ 3-4; Second Am. Compl. ("Compl.")[Doc. #69] ¶ 17; Duke's Answer [Doc. #86] ¶ 17.) According to a Divinity School publication, the Refectory Café sought to provide the Duke community with a "green dining" experience, focused on "buying local." (Pls.' Br., Ex. F [Doc. #147-6] at 23-26.[1]) Ms. Hall subsequently described the Refectory Café as a business "dedicated to environmental, social, [and] economic sustainability," and she believed this focus to be unique among dining services on Duke's campus. (Apr. 9, 2012 Letter [Doc. #170-8].) The Refectory Café apparently became popular within the Duke community, as evidenced by its receipt of numerous campus dining awards and the highest ranking on an internal survey commissioned by Duke. (See id. at 3; Pls.' Br., Ex. F [Doc. #147-6] at 23-26; Survey [Doc. #152-3] at 5.) Dr. Larry Moneta, Duke's Vice President of Student Affairs, believed the Refectory Café to be "one of [Duke's] exemplary operations." (Moneta Dep. [Doc. #147-7] at 75:13-25.) In 2008, Duke granted Bon Vivant a contract to open a second location of the Refectory Café at Duke Law School. (Compl. ¶ 33; Duke's Answer ¶ 33.)

Despite the Refectory Café's popular success at the Divinity School, by January 2012, the business was faltering. (Compl. ¶ 38; Duke's Answer ¶ 38.) Bon Vivant's contract with the Divinity School was set to expire at the end of June 2012, (Apr. 9 Letter [Doc. #170-8]),

---

[1] Citations refer to the page number assigned by the Court's electronic filing system.

2

and Duke informed Ms. Hall that if Bon Vivant wanted to continue operating at the Divinity School, it would have to pay a 15% gross revenue commission to Duke. (Compl. ¶ 39; Duke's Answer ¶ 39.) Ms. Hall informed Duke that to be financially sustainable, the Refectory Café could only afford to pay a 5% commission, which was the commission rate it paid at its law school location. (Apr. 9, 2012 Letter [Doc. #170-8]; Hall Dep. [Doc. #170-4] at 234:6-16.)

In April of 2012, while Bon Vivant and Duke were negotiating the renewal of the Operator's Agreement for the Divinity School location, Dr. Moneta submitted a letter to the <u>Duke Chronicle</u> "respond[ing] to outcry" over the Refectory Café's potential closing. (Compl., Ex. A [Doc. #69-1]; Duke's Answer ¶ 49.) Addressing "misinformation concerning the alleged closure of the Refectory in the Divinity School[,]" Dr. Moneta wrote that:

> what's at stake is not the closure of the dining unit in the Divinity School, nor of any change to the principles that govern the kind of food we feature there. We remain committed to featuring a highly "green" operation offering locally-sourced food with menus of great appeal to the diverse array of diners who eat there. What is at stake, then, is who the operator will be . . . .

(Compl., Ex. A; Duke's Answer ¶ 49.) Dr. Moneta went on to assure readers that regardless of who operated the dining facility at the Divinity School, "the overall quality, menu and pricing that is currently enjoyed at the Refectory will continue." (Compl., Ex. A [Doc. #69-1].)

On April 13, 2012, apparently while negotiations continued, Ms. Hall filed an application with the U.S. Patent and Trademark Office ("PTO") to register the "Refectory Café" mark. (Pl.'s Br., Ex. H [Doc. #149-8] at 2.) On November 27, 2012 the PTO issued a registration certificate for the "Refectory Café" mark. (<u>Id.</u> at 22.) The application and certificate identify Ms. Hall as the owner of the trademark. (<u>Id.</u> at 2, 22.)

In June of 2012, Patricia Eder ("Ms. Eder") submitted a proposal to Duke on behalf of her company, Core Catering, Inc. ("Core Catering"), to operate the Divinity School's dining facility. (Proposal [Doc. #152-4] at 3-41.) Ms. Eder, the President of Core Catering, (see Operator's Agreement [Doc. #152] at 21), had been an employee of Bon Vivant for four years, which she noted in the proposal. (Eder Dep. [Doc. #149-17] at 103:21-104:2.) Further, Core Catering's chef and director of catering had previously worked with Bon Vivant, which Ms. Eder also highlighted in the Proposal. (Id. at 104:3-18; Proposal [Doc. #152-4] at 10.)

Bon Vivant and Duke were ultimately unable to reach an agreement on the renewal terms of their contract, and Bon Vivant was required to vacate the dining space at the Divinity School by July 18, 2012.[2] (June 19, 2012 Letter [Doc. #170-7].) In July of 2012, Duke awarded Core Catering the contract to operate the dining facility vacated by the Refectory Café. (Operator's Agreement [Doc. #152].) Despite Ms. Eder's objections, Duke required Core Catering to operate under the name "Divinity Refectory." (Moneta Dep. [Doc. #149-19] at 186:22-187:18.) This was the only instance that Duke had required a vendor to use a particular name. (Id. at 186:22-187:2.) According to Duke, the Divinity Refectory and the Refectory Café "serve[d] similar types of food," both "focus[ing] on providing healthy, homemade foods[.]" (Coffey Dep. [Doc. #149-1] at 109:5-19; 113:15-22.) Following the opening of the Divinity Refectory, Plaintiffs contend that consumers confused the Divinity Refectory with

---

[2] In June of 2014, Bon Vivant also ceased operation of the Refectory Café at Duke Law School, after the contract expired without renewal. (Compl ¶ 130; Duke's Answer ¶ 130.) It appears that Plaintiffs continued to operate the Refectory Café at one off-campus location. (Pls.' Br., Ex. J [Doc. #147-10] at 212:15-18.)

the Refectory Café, and that "for two years, [Plaintiffs] had to defend the fact that [they] were [not] the Divinity Refectory . . . ." (Hall Dep. [Doc. #176-2] at 179:12-18.)

As a result of these events, Bon Vivant initially filed this action against Core Catering and affiliated individuals alleging trademark infringement under the Lanham Act and related state statutory and common law claims. (Original Compl. [Doc. #1].) After learning that Duke had required Core Catering to adopt the "Divinity Refectory" name, Bon Vivant amended the Complaint to add Duke as a defendant. (Mot. to Amend [Doc. #20] at 2; First Am. Compl. [Doc. #24].) Subsequently, pursuant to a stipulation, Bon Vivant dismissed its claims against two of the named individual defendants affiliated with Core Catering. (Stipulation [Doc. #23].) Thereafter, to address concerns regarding the proper plaintiff in this action, Bon Vivant amended the Complaint to add Laura Hall as a named plaintiff. (Compl. [Doc. #69].) Plaintiffs later dismissed their claims against Defendants Core Catering and Patricia Eder pursuant to a settlement agreement. (Consent Mot. to Dismiss [Doc. #118]; Feb. 24, 2016 Order [Doc. #131].)

Now remaining are the following claims asserted by Plaintiffs Bon Vivant and Laura Hall against Defendant Duke: (1) Infringement of a Registered Mark in Violation of Title 15 U.S.C. § 1114; (2) Unfair Competition in Violation of Title 15 U.S.C. § 1125(A); (3) Contributory and/or Vicarious Liability Under the Lanham Act; (4) Unfair Competition in Violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. GEN. STAT. § 75-1.1, et seq.; and (5) Unfair Competition in Violation of North Carolina Common Law.[3]

---

[3] The Court notes that on February 11, 2016, the Parties stipulated to an amendment of Plaintiffs' Second Amended Complaint, deleting Count IV which alleged misappropriation of trade secrets under the North Carolina Trade Secrets Protection Act. (Stipulation [Doc. #122] at 1-2.)

Duke, in turn, has asserted numerous affirmative defenses (Duke's Answer ¶¶ 188-223), as well as a counterclaim seeking a declaration that the trademark registration asserted by Plaintiffs is invalid, and an order that the trademark be cancelled pursuant to 15 U.S.C. § 1119, (id. ¶ 224).

Presently before the Court are four summary judgment motions. In addressing the Motions, the Court will first consider Duke's First Motion for Summary Judgment, in which it challenges the validity of the ownership and registration of the "Refectory Café" mark. Next, the Court will address Duke's Second Motion for Summary Judgment, in which Duke seeks judgment in its favor on all of Plaintiffs' claims on the basis that the term "refectory" is generic. The Court will then turn to Plaintiffs' Motion for Summary Judgment in which Plaintiffs argue that they are entitled to judgment as a matter of law on all of their claims. Finally, the Court will address Plaintiffs' Motion for Partial Summary Judgment seeking dismissal of several of Duke's affirmative defenses.

## II. STANDARD

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). A genuine issue of fact exists if the evidence presented could lead a reasonable fact-finder to return a verdict in favor of the non-moving party. Id. at 255. A court considering a motion for summary judgment must view all facts and draw all reasonable inferences from the evidence before it in the light most favorable to the non-

6

moving party.  Id.  The proponent of summary judgment "bears the initial burden of pointing to the absence of a genuine issue of material fact."  Temkin v. Frederick Cty. Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).  If the movant carries this burden, then the burden "shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact."  Id. at 718-19 (citing Anderson, 477 U.S. at 247-48).  A mere scintilla of evidence supporting the non-moving party's case is insufficient to defeat a motion for summary judgment.  See, e.g., Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994); see also Anderson, 477 U.S. at 248 (non-moving party may not rest upon mere allegations or denials.)  "In considering cross motions for summary judgment, a district court should 'rule upon each party's motion separately and determine whether summary judgment is appropriate as to each under the Rule 56 standard.'"  Adamson v. Columbia Gas Transmission, LLC, 987 F. Supp. 2d 700, 703 (E.D. Va. 2013) (quoting Monumental Paving & Excavating, Inc. v. Pa. Mfrs.' Ass'n Ins. Co., 176 F.3d 794, 797 (4th Cir. 1999)).  Therefore, the Court will set out the relevant background provisions under the Lanham Act, and will then consider each of the Party's Motions for Summary Judgment separately.

III.   DISCUSSION

Under the Lanham Act ("Act"), trademarks "include[] any word, name, symbol, or device . . . used by a person . . . to identify and distinguish his or her goods . . . from those manufactured or sold by others and to indicate the source of the goods." 15 U.S.C. § 1127. Because trademarks play a central role "in assuring consumers of the origin and quality of [ ] goods," Retail Servs., Inc. v. Freebies Publ'g, 364 F.3d 535, 538 (4th Cir. 2004), the Lanham Act seeks to prevent "the deceptive and misleading use of marks" and to protect the owners

7

of registered marks from unfair competition, 15 U.S.C. § 1127. See also Radiance Found., Inc. v. N.A.A.C.P., 786 F.3d 316, 321 (4th Cir. 2015) (noting that "[t]rademark infringement laws limit the ability of others to use trademarks or their colorable imitations in commerce, so that consumers may rely on the marks to make purchasing decisions.").

To prevail on a trademark infringement claim under the Lanham Act, a plaintiff must establish "[1] that it owns a valid and protectable mark, and [2] that the defendant's use of a 'reproduction, counterfeit, copy, or colorable imitation' of that mark creates a likelihood of confusion." George & Co. LLC v. Imagination Entm't Ltd., 575 F.3d 383, 393 (4th Cir. 2009) (quoting 15 U.S.C. § 1114(1)(a)). Thus, a plaintiff must show:

> (1) that it owns a valid and protectable mark, which requires both
>
>> (a) ownership of the mark and
>>
>> (b) validity (distinctiveness) of the mark; and
>
> (2) that the defendant's use of a similar mark creates a likelihood of confusion.

With respect to the validity of the mark, to be eligible for trademark protection, a mark must be distinctive. See Retail Servs., 364 F.3d at 538 (noting that "a [ ] mark cannot acquire trademark protection unless the mark is distinctive . . . ."). "In determining the distinctiveness of a given mark, courts use a categorical approach, placing the mark in one of four classifications that increase in distinctiveness as follows: generic, descriptive, suggestive, and arbitrary or fanciful." Id. (citing Pizzeria Uno Corp. v. Temple, 747 F.2d 1522, 1527 (4th Cir. 1984)). In this regard,

> [a] generic mark refers to the genus or class of which a particular product is a member and can never be protected. A descriptive mark describes a characteristic of a product and can only be protected if it has acquired secondary meaning, *i.e.*, if it has become distinctive of the maker's goods over time. A

8

> suggestive mark connotes a characteristic of a product, thereby enabling a consumer to infer something about the product from the mark. Both arbitrary and fanciful marks are totally unrelated to the product; the two differ, however, in that a mark qualifies as arbitrary if it is well-known in a different context, and fanciful if it is newly invented. With suggestive, arbitrary, and fanciful marks, "the association between the mark and its source is presumed and the mark is eligible for trademark protection." *See Perini,* 915 F.2d at 124–25. Because their "intrinsic nature" thus "serves to identify a particular source of a product," suggestive, arbitrary, and fanciful marks "are deemed inherently distinctive and are entitled to protection." *Two Pesos,* 505 U.S. at 768, 112 S. Ct. 2753.

Ashley Furniture Indus., Inc. v. SanGiacomo N.A. Ltd., 187 F.3d 363, 369 (4th Cir. 1999). Thus, to be valid and protectable, a mark must be either arbitrary, fanciful, or suggestive. In addition, a descriptive mark may also be valid and protectable if it has acquired secondary meaning. However, a generic mark, or a descriptive mark that has not acquired secondary meaning, would not be a valid and protectable mark.

A trademark owner may request registration of its trademark on the Principal Register by filing an application with the PTO. 15 U.S.C. § 1051. The Lanham Act provides that a mark's certificate of registration is "prima facie evidence of the validity of the registered mark and of the registration of the mark, of the owner's ownership of the mark, and of the owner's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate." 15 U.S.C. § 1057(b). Thus, when presented with a registered mark, a court will presume that the registrant is the owner of the mark, and will also presume that the mark "'is not generic in the eyes of the relevant public . . . and that its mark . . . at a minimum is descriptive and has obtained secondary meaning.'" Retail Servs., 364 F.3d at 542 (quoting America Online, Inc. v. AT & T Corp., 243 F.3d 812, 816 (4th Cir. 2001)). Where "the PTO registers a mark without requiring the applicant to submit proof of secondary meaning, 'it has presumptively determined the mark to be suggestive' and the certificate of

9

registration is prima facie evidence that the mark is suggestive." <u>Zinner v. Olenych</u>, 108 F. Supp. 3d 369, 383 (E.D. Va. 2015) (quoting <u>Synergistic Int'l, LLC v. Korman</u>, 470 F.3d 162, 172 (4th Cir. 2006)).

If the plaintiff establishes ownership of a valid and protectable mark, the plaintiff must then establish a likelihood of confusion. Determining whether an alleged infringer's use of the mark creates a likelihood of confusion requires consideration of the following factors: (1) the strength or distinctiveness of the senior mark;[4] (2) the similarity of the two marks; (3) the similarity of the goods/services the marks identify; (4) the similarity of the facilities the two parties use in their businesses; (5) the similarity of the advertising used by the two parties; (6) the defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public. <u>See</u> <u>George & Co.</u>, 575 F.3d at 393 (citing <u>Pizzeria Uno</u>, 747 F.2d at 1527 and <u>Sara Lee Corp. v. Kayser-Roth Corp.</u>, 81 F.3d 455, 463-64 (4th Cir. 1996)).

In the present case, in Defendant Duke's First Motion for Summary Judgment, Duke contends that Plaintiff Laura Hall does not own the "Refectory Café" mark and that the registration of the mark should be cancelled. In Duke's Second Motion for Summary Judgment, Duke argues that the "Refectory Care" mark is invalid because it is generic and thus not distinctive. Plaintiffs oppose both of these Motions. In addition, in Plaintiffs' Motion for Summary Judgment, Plaintiffs contend that they are entitled to judgment as a matter of law in their favor on their claims because they have established ownership and validity of the mark

---

[4] The distinctiveness of the mark is thus considered in determining the validity of the mark, and also in weighing the factors in the likelihood of confusion analysis.

and likelihood of confusion as a matter of law. Finally, in Plaintiff's Motion for Partial Summary Judgment, Plaintiffs seek dismissal of many of the affirmative defenses raised by Duke in its Answer. The Court will consider each of these Motions in turn.

## A. Defendant Duke University's First Motion for Partial Summary Judgment

In its First Motion for Partial Summary Judgment, Duke contends that the registered "Refectory Café" trademark is invalid and must be cancelled because if anyone owned the mark it was Bon Vivant, not Ms. Hall, and therefore Ms. Hall had no right to register the mark. (Duke's Mot. [Doc. #134] at 1.) Alternatively, Duke argues that even assuming that Ms. Hall owned the mark, cancellation is required because Ms. Hall failed to adequately indicate Bon Vivant's use of the mark in her trademark application. (Duke's Reply [Doc. #179] at 4-5.)[5]

The Lanham Act vests federal courts with the power to order the cancellation of registered marks. 15 U.S.C. § 1119. For a mark that has been registered for less than five years, cancellation may be based upon any ground that would have prevented registration initially.[6] See US Gates Int'l, LLC v. Light Star Travel Agency, Inc., No. 1:10CV32 JCC/JFA, 2010 WL 4643022, at *10 (E.D. Va. Nov. 8, 2010) (citing Cunningham v. Laser Golf Corp., 222 F.3d 943, 945-46 (Fed. Cir. 2000) and McCarthy on Trademarks and Unfair Competition (4th ed.) (hereinafter "McCarthy") § 20:52). Relevant here, "[a]n application filed in the name

---

[5] The Court notes that cancellation of the registration on these grounds would not necessarily preclude Bon Vivant from asserting its claim under the Lanham Act for unfair competition based on infringement of an unregistered trademark. See McCarthy on Trademarks and Unfair Competition (4th ed.) § 27:14 ("All courts have held that § 43(a) [of the Lanham Act] provides a federal vehicle for assertion of infringement of even unregistered marks and trade names." (emphasis in original)). However, cancellation of the registration would remove the statutory presumption that the mark is valid.

[6] Marks that have been registered and in continuous use for five years, which meet certain additional statutory requirements, achieve "incontestable" status and can only be challenged on limited statutory grounds. See Shakespeare Co. v. Silstar Corp. of Am., 9 F.3d 1091, 1094 (4th Cir. 1993) (citing 15 U.S.C. § 1065). In the instant case, there is no dispute that the "Refectory Café" mark has not attained "incontestable" status.

of an entity that did not own the mark as of the filing date of the application is void." 37 C.F.R. § 2.71(d); see also McCarthy § 16:35 ("Only the owner of a trademark may apply to register that mark . . . ."). In addition, "an individual may dispute the registrant's ownership of the mark as a means of contesting the validity of the registration." Brittingham v. Jenkins, 914 F.2d 447, 455 (4th Cir. 1990). The party seeking to cancel a registration bears the burden of establishing that the registration is invalid. See id. (noting that "the challenger bears the burden of refuting a registrant's presumption of ownership."); Pizzeria Uno, 747 F.2d at 1529.

Generally, a party establishes ownership of a trademark by being "the first to use the mark in the sale of goods." George & Co., 575 F.3d at 400. In the instant case, Ms. Hall filed her application to register "The Refectory Café" mark with the PTO on April 13, 2012. (Pls.' Resp., Ex. F. [Doc. #165-6].) "Laura Hall" was identified as the owner of the mark on the application. (Id. at 2.) Ms. Hall stated in the application that "the mark was first used by the applicant or the applicant's related company or licensee predecessor in interest at least as early as 08/01/2005." (Id. at 5.) As a specimen, Ms. Hall submitted an image of the Bon Vivant website showing use of the mark. (Id. at 3, 8.) On November 27, 2012, the PTO approved the application and granted Ms. Hall a registered trademark for "Refectory Café."[7] (Pls.' Resp., Ex. G [Doc. #165-7].) The certificate of registration states that the mark is for "restaurant services featuring healthy, homemade items." (Id.) "Laura Hall" is the sole registrant identified on the certificate of registration. (Id.)

---

[7] During the application process, the examining attorney, with the authorization of Ms. Hall's attorney, amended the mark from "The Refectory Café" to "Refectory Café," and entered a disclaimer indicating that the applicant was making no claim to the exclusive right to use "Café" apart from the mark as a whole. (Trademark Application [Doc. #149-8] at 15.)

12

In its Motion for Summary Judgment, Duke contends that there is no dispute that the "Refectory Café" mark was registered solely in the name of Laura Hall, but that Bon Vivant was the only entity to ever use the mark in commerce. Duke argues that, based on these undisputed facts, "it is abundantly clear that Laura Hall was not the owner of the mark" at the time the application was filed, and that "if anyone owned the mark at inception . . . it was Bon Vivant." (Duke's Mot. [Doc. #134] at 5-6.) In support of this position, Duke states that all restaurant services under the mark were provided by Bon Vivant as a legal entity separate and distinct from Ms. Hall. (Id. at 3.) Duke points to Ms. Hall's deposition testimony in which she affirmed that "all use of the term 'Refectory Café' [was] done through Bon Vivant Corporation." (Hall Dep. [Doc. #134-1] at 248:13-15.) Further, Duke notes that the Operator's Agreement for provision of dining services at the Divinity School was between Duke and Bon Vivant. (Duke's Mot., Ex. C [Doc. #134-3] at 2.) Finally, Duke points to Ms. Hall's testimony that Bon Vivant, rather than Ms. Hall, owned all assets associated with the Refectory Café, including the good will of the business. (Hall Dep. [Doc. #134-1] at 36:12-22.) In light of this evidence, Duke contends "there are no facts that support Ms. Hall's claim to ownership of the federally registered mark other than the registration itself." (Duke's Mot. [Doc. #134] at 4.)

In response, Plaintiffs concede that Bon Vivant was the entity that used the "Refectory Café" mark at the time Ms. Hall filed the application for registration. (Pls.' Resp. [Doc. #165] at 5-7.) However, they contend that Ms. Hall was properly listed as the owner of the mark, arguing that Bon Vivant was a "related company." (Id. at 5-7.) In this regard, the Lanham Act provides that a party may establish ownership of a mark by showing that it controlled the

first user of the mark.  15 U.S.C. § 1055; <u>see also</u> <u>Estate of Coll-Monge v. Inner Peace</u>

<u>Movement</u>, 524 F.3d 1341, 1347 (D.C. Cir. 2008).  Specifically, the Act states:

> Where a registered mark or a mark sought to be registered is or may be used legitimately by related companies, such use shall inure to the benefit of the registrant or applicant for registration, and such use shall not affect the validity of such mark or of its registration, provided such mark is not used in such manner as to deceive the public. If first use of a mark by a person is controlled by the registrant or applicant for registration of the mark with respect to the nature and quality of the goods or services, such first use shall inure to the benefit of the registrant or applicant, as the case may be.

15 U.S.C. § 1055.  The Act goes on to define "related company" as "any person whose use of

a mark is controlled by the owner of the mark with respect to the nature and quality of the

goods or services on or in connection with which the mark is used."  15 U.S.C. § 1127.  As

noted by the D.C. Circuit Court of Appeals, to acquire ownership of a mark through a related

company's use, "[t]he statute does not expressly require formal corporate control . . . .  Instead,

the statute requires control over only the use of a mark . . . with respect to the nature and

quality of the goods or services, which may include not only corporate control but also

licensing agreements and other types of oversight."  <u>Estate of Coll-Monge</u>, 524 F.3d at 1348

(internal quotation and citation omitted).  Thus, in a situation where a person's related

company uses the mark, "the party who controls the nature and quality of the goods or services

with which the mark is used is the owner of the mark, and should be the applicant for

registration of that mark."  McCarthy § 18:51.[8]

---

[8] The Court notes that Plaintiffs also suggest that Bon Vivant qualifies as Ms. Hall's related company because Bon Vivant is the exclusive licensee of the mark.  (Pls.' Resp. [Doc. #165] at 8-9.)  While an exclusive licensee of a mark may be a related company, the registrant must still demonstrate sufficient control over the licensee's use of the mark to acquire ownership of the mark.  <u>See</u> McCarthy § 18:51 (noting that a licensee can be a "related company," and that "the test of a 'related company' is the same as that used to determine whether adequate quality control is exercised over a trademark licensee.").  Accordingly, regardless of whether there was a valid licensing agreement between Ms. Hall and Bon Vivant, the test for "related company" remains the same.

In support of this position, Plaintiffs offer several facts related to Ms. Hall's control of Bon Vivant and its use of the "Refectory Café" mark. First, Plaintiffs note that Ms. Hall has served as the President of Bon Vivant since 2003. (Pls.' Resp., Ex. C [Doc. #165-3] at 2-13.) While Ms. Hall's husband served as Vice President of Bon Vivant between 2003 and 2012, (id.), Ms. Hall testified that he had no involvement in the operation of the company, (Hall Dep. [Doc. #165-1] at 31:8-21). Further, between 2005 and 2013, Ms. Hall was the controlling shareholder of Bon Vivant, with Mr. Hall as the sole minority shareholder. (Hall Decl. [Doc. #165-4] ¶¶ 3-4.) Additionally, Ms. Hall stated in her declaration that: (1) "all decisions regarding the day-to-day operation of Bon Vivant were made by me alone in my capacity as President and Majority Shareholder[;]" (2) "[s]ince Bon Vivant's use of the "Refectory Café" Mark began in 2006, I . . . have been solely responsible for reviewing, approving, and controlling all uses of the [mark], including by Bon Vivant, the exclusive licensee of the Mark[;]" (3) "Prior to dissemination to the public of any written use of the 'Refectory Café' Mark have [sic] always been reviewed and approved by me[;]" (4) "I hire and supervise all personnel of Bon Vivant[;]" and (5) "I also create, maintain, quality test, and otherwise control all of the goods and services, including food sold by Bon Vivant, which are sold using the 'Refectory Café' Mark." (Id. ¶¶ 4, 6-9.) Based on Ms. Hall's statements that she exerted complete control over Bon Vivant's use of the mark, Plaintiffs contend that she was properly listed as the owner in registering the mark. (Pls.' Resp. [Doc. #165] at 5.) Plaintiffs also note that this inquiry is "highly fact-intensive" and that Duke has failed to establish that there are no genuine issues of mater fact as to the ownership of the mark. (Id. at 5-6.)

15

Based on the evidence presented, Plaintiffs have proffered sufficient evidence that would permit a jury to find that Bon Vivant was a "related company" of Ms. Hall, and, thus, that Ms. Hall was the owner of the "Refectory Café" mark at the time it was registered. Viewing the evidence in the light most favorable to Plaintiff as the non-moving party, Duke has failed to show as a matter of law that Ms. Hall lacked the requisite control over Bon Vivant to establish her ownership of the mark.[9] See Estate of Coll-Monge, 524 F.3d at 1348 (reversing district court's entry of summary judgment where factual issues remained as to whether registrant of a mark sufficiently controlled the mark under related companies doctrine to establish ownership); see also Wallack v. Idexx Labs., Inc., No. 11CV2996-GPC KSC, 2015 WL 5943844, at *11 (S.D. Cal. Oct. 13, 2015) (denying the defendant's summary judgment motion where the plaintiff/registrant raised an issue of material fact as to whether the plaintiff exercised sufficient control over the mark to establish ownership).

Duke argues alternatively that even if Ms. Hall owned the "Refectory Café" mark, her failure to disclose Bon Vivant's use of the mark in her application invalidates the registration.

---

[9] Duke also contends that Ms. Hall cannot be the owner of the mark based on her testimony that Bon Vivant owns the "good will" of the business. (Duke's Mot. [Doc. #134] at 3-4, 6.) In support of its position, Duke cites Intrawest Fin. Corp. v. W. Nat. Bank of Denver, 610 F. Supp. 950, 956 (D. Colo. 1985), for the proposition that "[a]s a general rule, a trademark can only have one owner and that owner is the entity that controls the good will associated with the mark." (Duke's Reply [Doc. #179] at 3-4.) In considering this contention, the Court notes, first, that it is not evident that Ms. Hall intended to use "good will" as a legal term of art, rather than colloquially. Second, the court in IntraWest Fin. Corp. noted that the owner of a mark is the entity that *controls* the good will associated with the mark. As noted, there is sufficient evidence to permit a finding that Ms. Hall controlled the good will of the mark. Finally, Intrawest Fin. Corp. is distinguishable in that the case did not involve related companies. As the court stated, "First Interstate Bank is not a 'related company' of IntraWest Financial Corporation; First Interstate is in no way controlled by IntraWest Financial Corporation with respect to the nature and quality of any services offered. The good will associated with the mark, therefore, must reside in one institution or the other, and cannot reside in both." Id. (internal citation omitted). Accordingly, this case does not clarify how the control of good will relates to the ownership of the mark in the context of a related company.

16

(Duke's Reply [Doc. #179] at 5-6.)  As Duke correctly notes, at the time Ms. Hall filed her application in April of 2012, trademark regulations required that if an application was based on a related company's use of the mark, such fact had to be indicated in the application.  37 C.F.R. § 2.38(b) (2012).[10]  Plaintiffs contend that Ms. Hall satisfied this requirement by stating in her application that "the mark was first used by the applicant or the applicant's related company or licensee predecessor in interest at least as early as 08/01/2005."  (Pls.' Resp., Ex. F. [Doc. #165-6] at 5.)  Duke, in turn, argues that Plaintiffs' position is contradicted by Ms. Hall's declaration in the application that "to the best of [her] knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce . . . ."  (Id. at 5-6.)  Based on this statement, Duke argues that if Bon Vivant were truly an exclusive licensee or related company, "it would have the right to use the mark in commerce."  (Duke's Reply [Doc. #179] at 5.)

As noted previously, a court may cancel registration of a mark based upon any ground which would have initially prevented registration.  In the instant case, however, it is not evident that any failure by Ms. Hall to disclose Bon Vivant's use of the mark as required by 37 C.F.R. § 2.38(b) would have originally barred registration.  That is, any requirement to disclose information regarding a related company would appear to be an ex parte examination issue, and would not form a basis for cancellation.[11]  See The Sports Authority Michigan, Inc. v.

---

[10] The most recent version of 37 C.F.R. § 2.38, effective February 17, 2015, does not contain this requirement.

[11] While the Lanham Act sets out fraud as a basis for cancelling a mark, 15 U.S.C. § 1064(3), Duke does not argue that Ms. Hall's failure to disclose Bon Vivant's use of the mark amounts to fraud.  See Resorts of Pinehurst, Inc. v. Pinehurst Nat. Corp., 148 F.3d 417, 420 (4th Cir. 1998) (noting that to challenge a mark based on fraud, the challenging party "must prove by clear and convincing evidence that [the registering party] knowingly made false, material representations of fact and intended to deceive the [PTO]." (internal quotation and alteration omitted)).

<u>Kalle</u>, Opp. No. 122,577, 2002 WL 484958, at *3 (TTAB Mar. 29, 2002) (finding no authority to support the position that a trademark application was rendered void by the applicant's failure to indicate related company's use of the mark, as required by 37 C.F.R. § 2.38(b)); <u>cf.</u> <u>Flash & Partners S.P.A.</u>, 95 U.S.P.Q.2d 1813, at *2 (TTAB July 14, 2010) (noting that "compliance with the signature requirement was an ex parte examination issue [that] does not form a basis for cancellation[,]" and citing similar cases).

Moreover, even if failure to comply with 37 C.F.R. § 2.38(b) provided a valid ground for cancellation, Duke has not established that Ms. Hall failed to make the required disclosure. At the time Ms. Hall filed her application, the regulation required her to "indicate[]" that the mark to be registered was being used by a related company. 37 C.F.R. § 2.38(b). However, the governing regulations gave little guidance as to the extent of the required "indicat[ion]." Rather, the regulations provided only that "[t]he [PTO] may require such details concerning the nature of the relationship and such proofs as may be necessary and appropriate for the purpose of showing that the use by related companies inures to the benefit of the applicant and does not affect the validity of the mark." 27 C.F.R. § 2.38(c). The Trademark Manual of Examining Procedure ("TMEP" or "Manual") in effect at the time of Ms. Hall's application provides that "the applicant should state in the body of the application that the applicant has adopted and is using the mark *through its related company* (or equivalent explanatory wording)." TMEP 1201.03(a) (8th ed. 2011) (emphasis in original). [12] However, "[t]he applicant is not required to give the name of the related-company user, unless it is necessary to explain

---

[12] "Although the [TMEP] does not have the force of law, it sets forth the guidelines and procedures followed by the examining attorneys at the PTO." <u>In re Int'l Flavors & Fragrances, Inc.</u>, 183 F.3d 1361, 1366 (Fed. Cir. 1999) (internal quotation omitted).

information in the record that clearly contradicts the applicant's verified claim of ownership of the mark." Id. The Manual further provides that:

> [w]here the application states that use of the mark is by a related company or companies, the USPTO does not require an explanation of how the applicant controls the use of the mark.

> Similarly, the USPTO does not inquire about the relationship between the applicant and other parties named on the specimen or elsewhere in the record, except when the reference to another party clearly contradicts the applicant's verified statement that it is the owner of the mark or entitled to use the mark.

TMEP § 1201.03(b) (8th ed. 2011); see also TMEP § 1201.01.

As noted above, Ms. Hall indicated in her application that "the mark was first used by the applicant or the applicant's related company . . . ." Additionally, Ms. Hall attached a specimen to her application illustrating Bon Vivant's use of the "Refectory Café" mark on Bon Vivant's website. (Pls.' Resp., Ex. F. [Doc. #165-6] at 8.) The specimen clearly identifies Bon Vivant Catering, Inc. as the user of the mark. Based on this evidence, Duke has not shown as a matter of law that Ms. Hall failed to indicate in her application that the mark was being used by Bon Vivant. To the contrary, her statement that "the mark was first used by the applicant or the applicant's related company," in conjunction with the specimen showing Bon Vivant's use of the mark, appears to have provided some indication to the PTO examining attorney that Ms. Hall's claim of ownership was based on Bon Vivant's use of the mark. To the extent a contradictory statement in the application should have prompted the PTO examining attorney to inquire further into the relationship between Ms. Hall and Bon Vivant, such issue was part of the ex parte examination process, and does not provide grounds for cancelling the mark.

Based on the foregoing, Duke has not established as a matter of law that Ms. Hall's registration of the "Refectory Café" mark was invalid. Accordingly, the Court will recommend that Duke's First Motion for Partial Summary Judgment be denied.

B. Duke's Second Motion for Partial Summary Judgment

In Duke's Second Motion for Partial Summary Judgment, Duke seeks judgment in its favor on all of Plaintiffs' claims based on its contention that Plaintiffs' mark is generic and, thus, invalid and entitled to no trademark protection.[13] (Duke's Br. [Doc. #153] at 1.) In their Response, Plaintiffs argue that Duke cannot establish that the "Refectory Café" mark is generic as a matter of law. (Pls.' Resp. [Doc. # 169] at 1-2.)

As discussed above, registration of a mark with the PTO is prima facie evidence that the mark is valid and not generic. 15 U.S.C. § 1057(b). This presumption of validity shifts the burden of production to the party challenging the registered mark, and requires that party to produce sufficient evidence to show by a preponderance of the evidence that the mark is generic. Retail Servs., 364 F.3d at 542; see also Rebel Debutante LLC v. Forsythe Cosmetic Grp., Ltd., 799 F. Supp. 2d 558, 569 (M.D.N.C. 2011) ("In challenging the presumption, [the defendant] must introduce sufficient evidence, by a preponderance, to rebut the presumption of [the plaintiff's] right to exclusive use."). "To rebut the presumption that the mark is not

---

[13] The Court notes that even if Duke is able to establish that the "Refectory Café" mark is generic, it may be that a claim for unfair competition would remain. See Belmora LLC v. Bayer Consumer Care AG, __ F.3d __, 2016 WL 1135518, at *7 (4th Cir. 2016) (noting that "a plaintiff whose mark has become generic—and therefore not protectable—may plead an unfair competition claim against a competitor that uses that generic name and 'fail[s] adequately to identify itself as distinct from the first organization' such that the name causes 'confusion or a likelihood of confusion.'" (quoting Blinded Veterans Ass'n v. Blinded Am. Veterans Found., 872 F.2d 1035, 1043 (D.C. Cir. 1989)). However, the Court need not resolve that issue further as part of the present Motion.

generic, [the alleged infringer] must offer sufficient proof that 'the *primary* significance of the mark [is] its indication of the nature or class of the product or service, rather than an indication of source.'" Retail Servs., 364 F.3d at 544 (emphasis in original) (quoting Glover v. Ampak, Inc., 74 F.3d 57, 59 (4th Cir. 1996)). The evidence must also "demonstrate the generic understanding of the mark from the viewpoint of the relevant public." Id. (internal quotation omitted). Other evidence relevant to "genericness" generally includes competitors' use, plaintiff's use, dictionary definitions, media usage, testimony of persons in the trade, and consumer surveys. McCarthy § 12:13; see also Glover, 74 F.3d at 59. "If sufficient evidence . . . is produced to rebut the presumption, the presumption is 'neutralize[d]' and essentially drops from the case, although the *evidence* giving rise to the presumption remains." Retail Servs., 364 F.3d at 543 (alteration in original) (quoting America Online, 243 F.3d at 818).

When analyzing a composite mark's distinctiveness, courts apply the "anti-dissection rule," which requires consideration of the mark as a whole, rather than the component parts in isolation. See Buffalo Wings Factory, Inc. v. Mohd, 622 F. Supp. 2d 325, 333 (E.D. Va. 2007) (applying the "anti-dissection rule"); see also McCarthy § 11:27 (stating that "[u]nder the anti-dissection rule, a composite mark is tested for its validity and distinctiveness by looking at it as a whole, rather than dissecting it into its component parts."). Accordingly, "the whole, in trademark law, is often greater than the sum of its parts. Common words in which no one may acquire a trademark because they are descriptive or generic may, when used in combination, become a valid trademark." Ass'n of Co-op. Members, Inc. v. Farmland Indus., Inc., 684 F.2d 1134, 1140 (5th Cir. 1982); see also Buffalo Wings Factory, 622 F. Supp. 2d at 333 (noting that although the defendants argued that the plaintiff's mark was not entitled to

21

protection because it was merely a combination of two generic terms, the "[d]efendants [made] no argument demonstrating that the [mark], as a whole, [was] either generic or descriptive."). "However, it is not a violation of the anti-dissection rule to separately view the component parts as a preliminary step on the way to an ultimate determination of probable customer reaction to the composite as a whole." McCarthy § 11:27; see also Hunt Masters, Inc. v. Landry's Seafood Rest., Inc., 240 F.3d 251, 254 (4th Cir. 2001) (noting that when considering a mark's validity, "courts should not parse terms to determine that they are made up of generic components. However, the principle that a mark must be considered as a whole to determine its validity does not preclude courts from considering the meaning of individual words in determining the meaning of the entire mark." (internal citation omitted)).

In the present case, in arguing that Plaintiffs' mark is generic, Duke frames the issue of the case as "[w]hether Plaintiffs can prevent use of 'refectory' by entities other than Bon Vivant." (Duke's Br. [Doc. #153] at 1.) Duke argues that the word "refectory" is generic, and that "[b]ecause Plaintiffs have no enforceable monopoly rights in 'refectory,' Plaintiffs have no claim of any kind against Duke . . . ." (Id.) Duke also suggests that because it has not used the federally-registered "Refectory Café" mark, but instead has only used the "Divinity Refectory" mark, Plaintiffs cannot succeed in an infringement action. (Id. at 1 n.1.) That is, Duke contends that while "[Duke] may be unable to use the composite term, [it] cannot under any circumstances be prohibited from using the generic term." (Id. at 17.)

The Court notes that Duke's Motion appears to be based on a misunderstanding of the case. To begin, Plaintiffs have made no claim that they have any protectable interest in the word "refectory" alone. Rather, as Plaintiffs correctly state, they "seek only that to which

22

every [t]rademark [o]wner is entitled: the right to restrain the use of a mark that . . . is likely to cause confusion" with its own mark.  (Pls.' Resp. [Doc. #169] at 1 n.1.)  Duke's focus on the word "refectory" in isolation disregards the "anti-dissection" rule, which, as noted above, requires the Court to examine Plaintiffs' mark as a whole.  Regarding Duke's suggestion that it cannot be held liable because it did not use the identical mark over which Plaintiffs claim an interest, the Court notes that "the plaintiff need not demonstrate that the defendant is using an identical mark to succeed on a trademark infringement claim; the marks need only be similar."  Sweetwater Brewing Co., LLC v. Great Am. Restaurants, Inc., 266 F. Supp. 2d 457, 461 (E.D. Va. 2003) (citing Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc., 43 F.3d 922, 931-32 (4th Cir. 1995)).  Finally, Duke's assertion that it "cannot under any circumstances be prohibited from using the generic term" sweeps too broadly.  As previously acknowledged, generic words, which alone are entitled to no trademark protection, may become a valid trademark when used in combination.  See Ass'n of Co-op. Members, Inc., 684 F.2d at 1140. In this case, if the "Refectory Café" is a valid and protectable mark, any further issues regarding the strength of the mark and the similarity of Duke's "Divinity Refectory" would be considered as part of the likelihood of confusion analysis.  However, for purposes of Duke's Motion for Summary Judgment challenging the validity of the mark, the relevant inquiry is whether Duke has established that "Refectory Café" as a whole is generic as a matter of law.

On that issue, factual issues remain as to the distinctiveness of the "Refectory Café" mark.  Indeed, in its Reply, Duke appears to abandon its position that this case is about Duke's use of the word "refectory" in isolation, and instead concedes that "there are genuine factual disputes regarding whether 'Refectory Café' is a protectable mark."  (Duke's Reply [Doc.

23

#179] at 6 (emphasis omitted).) In addition, the certificate of registration for the "Refectory Café" mark provides *prima facie* evidence that the mark is valid, and the Fourth Circuit has cautioned district courts against granting summary judgment contrary to this presumption of validity. See RFE Indus., Inc. v. SPM Corp., 105 F.3d 923, 926 (4th Cir. 1997); see also U.S. Search, LLC v. U.S. Search.com Inc., 300 F.3d 517, 524 (4th Cir. 2002); Retail Servs., 364 F.3d at 543-44. Based on the presumption of validity, and in light of the remaining factual disputes, the Court will recommend that Duke's summary judgment motion be denied on the issue of the mark's validity.[14]

Duke raises two additional arguments in its summary judgment motion, although in its Reply [Doc. #179], Duke does not continue to argue that it is entitled to summary judgment on these two additional issues. First, Duke argues that Plaintiffs are barred from recovering damages for loss of good will. (Duke's Br. [Doc. #153] at 19-20.) Specifically, Duke contends that in light of Plaintiffs' statement that "Ms. Hall is not claiming personal damage separate

---

[14] Duke also contends that the registration was invalid based on a discrepancy between the specimen Ms. Hall submitted in support of her application and the mark that was ultimately registered. Specifically, the specimen indicated that Ms. Hall sought to register "The Refectory Café," while the registered mark, "Refectory Café," omits the word "the." Duke contends that this omission rendered the mark void *ab initio*. (Duke's Br. [Doc. #153] at 17-18.) However, the insufficiency of a specimen does not generally render a mark void. See Marshall Field & Co. v. Mrs. Fields Cookies, 11 USPQ2d 1355, 1358 (TTAB 1989) (the insufficiency of the specimens does not per se constitute grounds for cancellation); Century 21 Real Estate Corp. v. Century Life of Am., 10 USPQ2d 2034, 2035 (TTAB 1989) (the adequacy of specimens is solely a matter of ex parte examination). An insufficient specimen will form the basis for cancellation only where an applicant's specimen prevented the PTO from considering the mark as it is actually used in commerce. See Teal Bay Alls., LLC v. Southbound One, Inc., No. MJG-13-2180, 2015 WL 401251, at *9-10 (D. Md. Jan. 26, 2015). Here, although the PTO ultimately registered the mark as "Refectory Café," the specimen indicated exactly how the proposed mark was used in commerce. Further, during the application process, the PTO examining attorney, with the authorization of Ms. Hall's attorney, amended the mark from "The Refectory Café" to "Refectory Café," and required no additional response from Ms. Hall. (Pls.' Br., Ex. O [Doc. #147-15].) There is no evidence that the specimen prevented the PTO from considering the mark as it was actually used in commerce. By contrast, in Teal Bay, the case Duke relies on in its Reply brief, the applicant intended to mislead the PTO by submitting a specimen which had never been used in commerce. Id. at *9.

from that of Bon Vivant[,]" Ms. Hall has abandoned any claim to damages for loss of good will.  (Id. at 19.)  However, as previously noted, Ms. Hall contends that Bon Vivant is a related company, and she confirms in her Response that she is seeking to recover loss of good will related to the mark, notwithstanding the fact that such good will was established through Bon Vivant's use of the mark.  Cf. Lunkenheimer Co. v. Pentair Flow Control Pac. PTY Ltd., No. 1:11-CV-824, 2014 WL 4450034, at *10 (S.D. Ohio Sept. 10, 2014) (noting that "the goodwill associated with a trademark, even if developed by a licensee, inures to the benefit of the trademark owner").  Plaintiffs' statement that Ms. Hall is not seeking *personal* damages separate from Bon Vivant is not to the contrary.  Therefore, the Court cannot conclude that Ms. Hall has abandoned any claim for damages for loss of good will.

Second, Duke asserts that Plaintiffs have no basis for their claim under the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA").  (Duke's Br. [Doc. #153] at 18-19.)  However, the Court addressed Plaintiff's UDTPA claim in denying Duke's prior Motion to Dismiss (Recommendation [Doc. #58]), and Duke has not shown that there are no genuine issues of material fact on Plaintiff's UDTPA claim.  Further, to the extent Duke argues that Plaintiffs' claim under the UDTPA fails for lack of evidence of damages, the Court notes that Plaintiffs here seek damages for loss of goodwill and consumer confusion.  Cf. Microsoft Corp. v. Computer Serv. & Repair, Inc., 312 F. Supp. 2d 779, 785 (E.D.N.C. 2004) (granting summary judgment in favor of plaintiff on a UDTPA claim where defendant's trademark infringement caused actual harm to plaintiff by diminishing plaintiff's goodwill and confusing consumers).  The nature and measurement of damages for any such harm is a matter for trial.

Based on the foregoing, the Court will recommend that Duke's Second Motion for Partial Summary Judgment be denied in its entirety.

C. <u>Plaintiffs' Motion for Summary Judgment on all Claims</u>[15]

In Plaintiffs' Motion for Summary Judgment on all claims, Plaintiffs seek judgment in their favor that Duke infringed their registered mark as a matter of law, that no genuine issues of fact remain as to the alleged infringement, and that Plaintiffs are entitled to damages as a matter of law. According to Plaintiffs, all of their claims turn on whether Duke violated the Lanham Act by infringing Plaintiffs' registered "Refectory Café" mark. (<u>See</u> Pls.' Br. [Doc. #149] at 2 n.2.)

As discussed above, a trademark plaintiff must establish both ownership of a valid mark and that the defendant's use of the mark creates a likelihood of confusion among the relevant consuming public. In the instant case, the Parties dispute the ownership of the mark, whether "Refectory Café" is a valid mark entitled to trademark protection, and whether Duke's use of "Divinity Refectory" creates a likelihood of confusion, as discussed below.

1. <u>Validity and Ownership of the "Refectory Café" mark</u>

As noted previously, the PTO granted a certificate of registration to Ms. Hall for the "Refectory Café" mark on November 27, 2012. (Pls.' Br., Ex. H [Doc. #149-8] at 22.) Where "the PTO registers a mark without requiring the applicant to submit proof of secondary

---

[15] Plaintiffs have requested oral argument on both of their summary judgment motions. However, pursuant to Local Rule 7.3(c), "[m]otions shall be considered and decided by the Court on the pleadings, admissible evidence in the official court file, and motion papers and briefs, without hearing or oral argument, unless otherwise ordered by the Court. Special considerations thought by counsel sufficient to warrant a hearing or oral argument may be brought to the Court's attention in the motion or response." Here, Plaintiffs' counsel has not highlighted any special considerations warranting oral argument, and the Court finds the Motions can be resolved on the briefing.

26

meaning, 'it has presumptively determined the mark to be suggestive' and the certificate of registration is prima facie evidence that the mark is suggestive." Zinner, 108 F. Supp. 3d at 383 (quoting Synergistic Int'l, LLC, 470 F.3d at 172); see also U.S. Search, LLC, 300 F.3d at 524 (noting that the PTO's "decision to register a mark, without requiring evidence of secondary meaning, is powerful evidence that the registered mark is suggestive and not merely descriptive." (internal quotation omitted)). In order to rebut a presumption that a mark is suggestive, the challenging party must produce evidence that the mark is generic or is merely descriptive. See Borinquen Biscuit Corp. v. M.V. Trading Corp., 443 F.3d 112, 118 (1st Cir. 2006); see also PaperCutter, Inc. v. Fay's Drug Co., 900 F.2d 558, 563 (2d Cir. 1990) (noting that "[t]he presumption [of suggestiveness] may be rebutted by a showing that the mark is descriptive, not suggestive."). Here, because the PTO did not require Ms. Hall to submit proof of secondary meaning, the Court presumes that the "Refectory Café" mark is, at minimum, suggestive. Thus, in order to demonstrate a genuine dispute over the validity of the mark, Duke must proffer sufficient evidence that would permit a fact finder to determine by a preponderance of the evidence that the mark is either generic or merely descriptive. See Rebel Debutante, 799 F. Supp. 2d at 569.

Duke contends summary judgment is unwarranted in Plaintiffs' favor due to "factual disputes regarding the protectability of the mark." (Duke's Resp. [Doc. #173] at 3.) In particular, Duke maintains that "Refectory Café" is at best a descriptive mark, and that it has effectively rebutted the presumption that the mark is suggestive. (Id. at 6.) In support of its position, Duke asserts that Plaintiffs' own allegations establish that the mark is descriptive. (Id.) For example, Duke notes that Plaintiffs define "refectory" as a "communal dining hall

typically in a monastery."[16]  (Compl. [Doc. #69] ¶ 18.)  Further, Duke points to Plaintiffs'
allegation that "Ms. Hall felt strongly that the name The Refectory Café would capture the
spirit of her communal dining concept while reinforcing its association with the divinity
school." (Duke's Resp. [Doc. #173] at 6-7.)  Duke argues that "'Refectory Café' described
exactly what Ms. Hall offered under the mark – a café featuring communal dining located in
the Divinity School." (Id. at 7.)

       While a mark's distinctiveness may be more easily ascertainable at the opposite ends of
the spectrum (that is, either as generic or as arbitrary or fanciful), courts often confront
difficulties in distinguishing between descriptive and suggestive marks.  See Pizzeria Uno
Corp., 747 F.2d at 1527-29.  This distinction is particularly consequential, because, as noted
previously, descriptive marks are entitled to trademark protection only upon a showing of
secondary meaning, "while suggestive marks are considered presumptively valid." Lone Star
Steakhouse & Saloon, Inc., 43 F.3d at 933.  Generally, a mark is descriptive if it "identifies a
characteristic or quality of [a] service," id., or "imparts information directly," Pizzeria Uno
Corp., 747 F.2d at 1528.  In contrast, "[i]f [the mark] stands for an idea which requires some
operation of the imagination to connect it with the goods, it is suggestive." Id. (internal
quotation omitted).

       Here, Duke has identified a triable issue of fact with respect to whether the "Refectory
Café" mark is merely descriptive.  As Duke notes, Plaintiffs themselves allege that "refectory"
refers to a "communal dining hall typically in a monastery," and that Ms. Hall intended the

---

[16] As noted previously, while the Court must analyze the validity of the mark by looking at the mark as a whole,
the Court may consider the component parts of the mark as part of its analysis.

"Refectory Café" name to give the impression of a communal dining space. Further, the Court notes that the certificate of registration states that the "Refectory Café" mark is "for restaurant services featuring healthy, homemade items . . . ." (Pls.' Br., Ex. H [Doc. #149-8] at 22.) Even in light of the presumption of validity, these facts create a genuine issue as to whether "Refectory Café" merely describes the dining services Plaintiffs provided at Duke Divinity School. That is, a reasonable juror could find that the "Refectory Café" mark directly imparts information about the service Plaintiffs provided.[17]

The Court notes that Plaintiffs have offered consumer survey evidence (Jacobs-Meadway Report [Doc. #149-3]), which they contend shows "that over eighty-six percent [] of people have no idea what the word 'refectory' means . . . ." (Pls.' Br. [Doc. #149] at 5.) Thus, Plaintiffs argue, the mark cannot be merely descriptive as it "does not impart any information . . . to over eighty-six [] percent of the population." (Id. at 8 (emphasis omitted).) However, Duke contests whether these numbers accurately reflect the understanding of the "relevant consuming public." (See Duke's Resp. [Doc. #173] at 12.) Specifically, while Plaintiffs appear to assume that the relevant consumer group is the Duke community at large, (see Pls.' Br. [Doc. #149] at 9), their survey identified the relevant public as "mainstream speakers of the English language," (Jacobs-Meadway Report [Doc. #149-3] at 2). The survey

---

[17] In support of their position that summary judgment is warranted in their favor, Plaintiffs cite RFE Indus., Inc., 105 F.3d at 926, for the proposition that "[t]he Fourth Circuit has repeatedly expressed clear frustration with a district court substituting its opinion for that of the USPTO." (Pls.' Reply [Doc. #176] at 4 n.3.) In that case, however, the Fourth Circuit admonished district courts for "freely substituting [their] opinion for the PTO's" in granting summary judgment based on a finding contrary to the PTO's determination. RFE Indus., 105 F.3d at 326. Here, of course, in recommending denial of Plaintiffs' summary judgment motion, the Court is not substitut[ing] its opinion for the PTO's opinion. Rather, the Court is finding that factual issues remain as to the mark's descriptiveness, but the PTO's determination continues to provide prima facie evidence of the validity of the mark.

29

also noted that among college-educated respondents, which may be more representative of the relevant consumer group at issue here, the number of respondents who knew what the word "refectory" referred to increased to thirty percent. (Id. at 8.) Accordingly, the Court cannot find that the survey evidence, even when considered in conjunction with the presumption of validity, establishes as a matter of law that the mark is suggestive rather than descriptive.[18]

In response to Plaintiffs' instant Motion, Duke also argues again that the word "refectory" is merely generic. (Duke's Resp. [Doc. #173] at 11.) It contends that "[t]he record is [] replete with evidence that 'refectory' identifies the 'nature or general class of goods and services' offered and is thus generic." (Id.) In particular, Duke notes that it used the word "refectory" to identify the Divinity School's dining space prior to Plaintiffs' operation of the "Refectory Café" at the Divinity School. (S. Jones Dep. [Doc. #170-6] at 20:11-21:10.) For example, at least since 2005, the dining space at the Divinity School has been identified with a door sign reading "Refectory" in English and Braille. (Id. at 33:1-24; 36:15-39:11; Dep. Ex. 77 [Doc. #170-10]; G. Jones Decl. [Doc. #156-3] ¶ 10.) Duke additionally maintains that its

---

[18] In Plaintiffs' Reply, they contend that the mark's validity presents a purely legal question suitable for resolution at the summary judgment stage. (Pls.' Reply [Doc. #176] at 4 (stating that "[a]s there is no factual dispute, the Court is faced with the purely legal question of whether a word that the vast majority of the population does not know is 'descriptive' of anything.").) However, Duke has noted several issues of material fact which remain, including whether "the vast majority of the [relevant] population does not know" the word "refectory," as Plaintiffs contend. See, e.g., Lumber Liquidators, Inc. v. Stone Mountain Carpet Mills, Inc., 3:08CV573HEH, 2009 WL 2013599, at *7 (E.D. Va. July 10, 2009) (finding that factual issues regarding whether a mark was suggestive or descriptive precluded summary judgment on the validity of the mark).

The Court notes that Plaintiffs also contend that the survey evidence establishes that the word "refectory" is fanciful. (Pls.' Br. [Doc. #149] at 4-6.) Such argument would appear to disregard the Fourth Circuit's identification of a fanciful mark as one that is "totally unrelated to the product" and "newly invented." Ashley Furniture Indus., 187 F.3d at 369. In any event, having found that genuine issues exist regarding whether the "Refectory Café" mark is even suggestive, the Court cannot conclude that the mark is fanciful as a matter of law.

use of the word "refectory" is consistent with "roughly uniform" dictionary definitions of the word. (Duke's Resp. [Doc. #173] at 11-12 (citing Worthy Decl. [Doc. #171] ¶¶ 1-3).) As discussed above with respect to Duke's Motion for Summary Judgment, the Court must consider the mark as a whole, consistent with the "anti-dissection" rule, but the evidence regarding the component parts can be considered in the analysis, and the evidence presented by Duke demonstrates that factual issues remain regarding the distinctiveness of the "Refectory Café" mark.

Finally, Duke also raises disputed factual issues regarding the ownership of the mark. In this regard, Duke argues that summary judgment is improper based on disputed issues surrounding the validity of Ms. Hall's claim of ownership over the mark. (Duke's Resp. [Doc. #173] at 5.) As discussed previously in relation to Duke's First Motion for Partial Summary Judgment, see supra Part III.A, issues of fact remain regarding whether Ms. Hall owned the mark at the time she filed her trademark application. In particular, whether Ms. Hall owned the mark would appear to turn on the extent of her control over Bon Vivant's use of the mark – a factual issue not before the Court on Plaintiffs' instant summary judgment motion. Duke also contends that Bon Vivant may not bring an infringement action because it was not the "registrant" of the mark. (Id. at 3.) In response to this argument, Plaintiffs state only that the Court need not reach the issue, as it can enter judgment in favor of Plaintiff Ms. Hall on the infringement claim and in favor of Plaintiff Bon Vivant on the unfair competition claim. (Pls.' Reply [Doc. #176] at 2.). However, this would not establish an absence of genuine issues of material fact regarding the ownership of the mark.[19]

---

[19] In Plaintiffs' related summary judgment motion, see infra Part III.D, Plaintiffs contend that Bon Vivant has

In sum, because genuine issues of material fact exist as to the mark's validity and ownership, summary judgment in favor of Plaintiffs should not be granted.

### 2. Likelihood of confusion

As noted previously, a successful Lanham Act plaintiff must prove both that it owns a protectable mark and that the defendant's use of the mark creates a likelihood of confusion among the relevant consuming public. Here, even assuming that Plaintiffs were entitled to judgment as a matter of law on the validity of the mark, it appears that remaining issues of fact regarding the likelihood of confusion would serve as an independent basis for precluding summary judgment in Plaintiffs' favor. See Lone Star, 43 F.3d at 935 (stating that "[l]ikelihood of consumer confusion remains an independent requirement for trademark infringement.").

As noted above, determining whether an alleged infringer's use of the mark creates a likelihood of confusion requires consideration of the following factors: (1) the strength or distinctiveness of the senior mark; (2) the similarity of the two marks; (3) the similarity of the goods/services the marks identify; (4) the similarity of the facilities the two parties use in their businesses; (5) the similarity of the advertising used by the two parties; (6) the defendant's

---

standing to bring an infringement action based on its status as the exclusive licensee of Ms. Hall's mark. (Pls.' Br. [Doc. #147] at 18-19.) As this Court previously stated in addressing Duke's prior Motion to Dismiss, it would appear that an exclusive licensee of a mark has standing to sue for infringement only in limited circumstances – namely, where the exclusive licensee is tantamount to an assignee of the ownership rights of the mark. Bon Vivant Catering, Inc. v. Duke Univ., No. 1:13CV728, 2015 WL 5024006, at *2 (M.D.N.C. Aug. 25, 2015), report and recommendation adopted, No. 1:13CV728, 2015 WL 5712597 (M.D.N.C. Sept. 29, 2015); see also Calvin Klein Jeanswear Co. v. Tunnel Trading, No. 98 Civ. 5408(THK), 2001 WL 1456577, at *4–5 (S.D.N.Y. Nov. 16, 2001) ("Where a licensing agreement does not grant the licensee a property interest in the mark or otherwise assign to the licensee the registrant-licensor's ownership rights, the licensee, even if exclusive, cannot enforce the mark under § 1114."). Here, it is undisputed that Ms. Hall and Bon Vivant had no written exclusive licensing or assignment agreement, (see Pls.' Resp. [Doc. #165] at 7 n.2, 11 n.8), and to the extent Plaintiffs contend that such an agreement was implied, they have not presented sufficient evidence on that issue to entitle them to judgment as a matter of law. Further, Plaintiffs provide no support that such an implied agreement would be sufficient to confer standing on Bon Vivant to bring an infringement action.

intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public. See George & Co. LLC, 575 F.3d at 393 (citing Pizzeria Uno Corp., 747 F.2d at 1527 and Sara Lee Corp., 81 F.3d at 463-64). Courts generally view the strength of the senior mark and evidence of actual confusion as the two most important factors. See Sara Lee, 81 F.3d at 467 ("If the strength of the senior mark is the alpha of infringement analysis, then evidence of actual confusion is surely the omega . . . .").

Plaintiffs contend that based on the above factors, they have established likelihood of confusion as a matter of law. (Pls.' Br. [Doc. #149] at 4.) Specifically, Plaintiffs maintain that the PTO's registration of the "Refectory Café" mark arms them with strong evidence that the mark is suggestive, and thus conceptually strong. (Id.) Next, Plaintiffs argue that the mark is commercially strong, as evidenced by the Refectory Café's numerous campus dining awards, unsolicited media coverage, and gross sales figures. (Id. at 11.) Turning to the "similarity factors," see Sara Lee Corp., 81 F.3d at 465 (referring to factors 2-5 as the "similarity factors"), Plaintiffs argue that the dominant portions of the two marks – "Refectory" – are identical; that the respective services the marks identify – dining services on a college campus — are identical; that the facilities used in their businesses — the same physical location on Duke's campus — are identical; and that the Parties' methods of advertising — daily menus advertised on sandwich boards, posted to social media accounts, and directed at the same consumer group — were starkly similar. (Id. at 12-16.)

Plaintiffs further contend that Duke adopted the "Divinity Refectory" mark "with full knowledge of Plaintiffs' Trademark," thereby intending to benefit from the successful business built by Plaintiffs. (Id. at 17.) As evidence of Duke's wrongful intent, Plaintiffs point to

33

Duke's decision to select Core Catering, which had previously highlighted for Duke its similarity to Bon Vivant, to operate the Divinity School's dining facility. Plaintiffs further note Duke's insistence that Core Catering adopt the "Divinity Refectory" mark over Core Catering's objection – the only instance Duke had ever made such a demand. (Id. at 16-18.) Plaintiffs have also produced anecdotal evidence of nearly forty instances of actual consumer confusion. (Id. at 18-19.) Finally, regarding the sophistication of the relevant consuming public, Plaintiffs contend that because "members of [the Duke] community are among the most educated and sophisticated markets in the country, the fact that so many were confused by Duke's conduct is especially probative." (Id. at 19.)

In considering these factors, there is certainly sufficient evidence from which a jury could find that Duke's use of the "Divinity Refectory" mark created a likelihood of confusion among the relevant consuming public. However, on Plaintiffs' Motion for Summary Judgment, the issue is whether that is the *only* reasonable conclusion. In response to Plaintiffs' Motion, Duke identifies several remaining factual issues with respect to the above factors. For example, Duke correctly notes that there remain factual disputes surrounding the distinctiveness, and thus the conceptual strength, of the mark, based on the evidence discussed at length above. (Duke's Resp. [Doc. #173] at 8.) See George & Co., 575 F.3d at 393-94 (noting that "[a] mark's conceptual strength is determined in part by its placement into one of [the] four categories of distinctiveness . . . .").[20] Duke additionally disputes the commercial

---

[20] As part of this discussion, Duke also notes that where the mark is a two-word composite and one word has been disclaimed, the Court should "look to the term not disclaimed as the dominant term and determine distinctiveness largely on the basis of that dominant term." Pizzeria Uno Corp., 747 F.2d 1530, 1533 ("And while a composite term, including disclaimed words or figures, is to be considered in its entirety in determining validity of a trade mark, it is a settled principle of trade mark law that [t]he dominant part of a mark may be given extra weight on the issue of likelihood of confusion." (internal quotation omitted)). Here,

34

success that Plaintiffs achieved under the mark, noting that Plaintiffs have pled that the Refectory Café was losing money, that the evidence reveals minimal advertising expenses, and that Plaintiffs have failed to offer a consumer study linking the mark to Plaintiffs. (Duke's Resp. [Doc. #173] at 14.) Moreover, Duke argues that it had a good faith belief that it was entitled to use the "Divinity Refectory" mark, and therefore possessed no bad faith intent to infringe Plaintiffs' mark. (Id. at 16-17.) Duke also points to factual issues as to the similarity of the marks as used in the commercial context (id. at 15), and the similarity in the appearance of the Parties' advertising (id. at 16).

In this case, the Court finds that the jury is best suited to conduct the likelihood of confusion analysis by weighing the above factors. The inquiry is "inherently factual," Anheuser-Busch, Inc. v. L. & L. Wings, Inc., 962 F.2d 316, 318 (4th Cir. 1992), and is thus "particularly amenable to resolution by a jury," Fuel Clothing Co. v. Nike, Inc., 7 F. Supp. 3d 594, 609 (D.S.C. 2014). Summary judgment on likelihood of confusion is appropriate only in limited circumstances not presented in this case. See Polo Fashions, Inc. v. Craftex, Inc., 816 F.2d 145, 148 (4th Cir. 1987) (affirming district court's entry of summary judgment in favor of plaintiff where "the likelihood of confusion was [ ] unassailably established."); see also Nat'l Fed'n of the Blind, Inc. v. Loompanics Enterprises, Inc., 936 F. Supp. 1232, 1241 (D. Md. 1996) ("The determination of likelihood of confusion is an inherently factual issue. Because of the fact-intensive nature of this inquiry, summary judgment is the exception." (internal quotation and citations omitted)). Therefore, Plaintiffs' Motion for Summary Judgment

---

Laura Hall disclaimed the term "café" in the registration application. Thus, even if "Refectory Café" is valid as a whole, the focus in considering the distinctiveness of the mark in the likelihood of confusion analysis is the distinctiveness of the dominant term "refectory."

should also be denied on the basis that Plaintiffs have not shown likelihood of confusion as a matter of law.

D. Plaintiffs' Motion for Partial Summary Judgment on Duke's Affirmative Defenses

Finally, the Court turns to Plaintiffs' Motion for Partial Summary Judgment, in which Plaintiffs seek judgment in their favor on the following thirteen of Duke's eighteen asserted affirmative defenses: (1) Failure to State a Claim, (3) Fair Use and Descriptive Usages Permitted, (5) Invalid Trademark Application and Registration, (6) Abandonment, (7) Acquiescence and/or Permission, (9) Unclean Hands, (10) Contribution to Damages and Failure to Mitigate, (12) Laches, (13) Statute of Limitations, (14) Preemption, (15) Lack of Subject Matter Jurisdiction, (16) Lack of Ownership and Standing, (17) and Misuse.[21]  (Pls.' Br. [Doc. #147] at 1; see also Duke's Answer [Doc. #86] ¶¶ 188-222.)   In response to Plaintiffs' position that "all of [their] claims depend only on the allegedly improper use of the mark 'Divinity Refectory,'" Duke abandons all of the challenged affirmative defenses except "Invalidity of Trademark," "Statute of Limitations," "Lack of Ownership and Standing," "Failure to State a Claim," and "Lack of Subject Matter Jurisdiction."  (Duke's Resp. [Doc. #172] at 2-3, 6-7).

As discussed in detail above, there are factual issues which remain regarding the ownership and validity of the trademark.  See supra Part III.B-C.   Accordingly, summary judgment in favor of Plaintiffs on Duke's "Lack of Ownership and Standing" and "Invalidity of Trademark" defenses is inappropriate.

---

[21] Each defense is identified by the number assigned to the defense in Duke's Answer [Doc. #86].

With respect to Duke's statute of limitations defense, the Parties dispute whether a three-year or four-year limitations period applies to Plaintiffs' infringement action. The Lanham Act does not provide a statute of limitations, and courts therefore borrow the analogous state law limitations period. See PBM Prods., LLC v. Mead Johnson & Co., 639 F.3d 111, 121 (4th Cir. 2011). Citing North Carolina General Statute § 1-52(2), Duke contends that the applicable limitations period is three years. (Duke's Answer [Doc. #86] ¶ 216; Duke's Resp. [Doc. #172] at 5.) Noting that Ms. Hall was not added as a plaintiff until October 16, 2015, (see Second Am. Compl. [Doc. #69]), Duke argues that "to the extent Ms. Hall's claims depend on alleged infringement prior to October 16, 2012, the claims are barred . . . ." (Id.) Plaintiffs contend for the first time in their Reply that the UDTPA's four-year limitations period governs, and that therefore Ms. Hall's infringement claim encompasses all of the alleged infringement, which Plaintiffs contend began in July 2012. (Pls.' Reply [Doc. #175] at 4.)

In considering these contentions, the Court notes that it appears that the UDTPA is the state law most analogous to a Lanham Act infringement claim, and therefore a four-year limitations period would apply. N.C. Gen. Stat. § 75-16.2; cf. Lyons P'ship, L.P. v. Morris Costumes, Inc., 243 F.3d 789, 796 (4th Cir. 2001) (applying the four-year UDTPA limitations period to a Lanham Act infringement action where the parties agreed the UDTPA was "appropriately analogous"); High Volatage Beverages, LLC v. Coca-Cola Co., No. 3:08CV367, 2011 WL 831523, at *3 (W.D.N.C. Mar. 3, 2011) (applying four-year limitations period to Lanham Act infringement claim). However, Plaintiffs raised this argument for the first time in their Reply and Duke has therefore had no opportunity to address it. Further, even if a three-year limitations period applied, the Parties have not addressed: (1) whether under Rule

37

15(c) of the Federal Rules of Civil Procedure, the amendment of the Complaint adding Ms. Hall as a plaintiff would relate back to June 24, 2014, the date Plaintiff Bon Vivant first asserted an infringement action against Duke, see Fed. R. Civ. P. 15(c) advisory committee's note (1966 Amendment) (stating that "the attitude taken in revised Rule 15(c) toward change of defendants extends by analogy to amendments changing plaintiffs."); see also Penn Millers Ins. Co. v. United States, 472 F. Supp. 2d 705, 711-12 (E.D.N.C. 2007) (noting that every circuit to consider the issue has found that Rule 15(c) applies to amendments changing plaintiffs); or (2) whether under Rule 17(a)(3), Ms. Hall was joined as the real party in interest for the infringement claim.

In any event, the outcome of the Parties' statute of limitations dispute does not affect whether Ms. Hall can assert an infringement claim, as Plaintiffs contend that "Duke's [i]nfringement has actually continued at least through March of 2016." (Pls.' Reply [Doc. #175] at 4 n.3.) Rather, the issue merely determines how far back Ms. Hall could claim damages if Duke were found liable for the alleged infringement. Thus, to the extent this dispute affects how the issue of damages should be submitted to a jury, it is more appropriately addressed at trial. Accordingly, the Court will recommend that Plaintiffs' summary judgment motion be denied as to Duke's statute of limitations defense.

Finally, with respect to Duke's "affirmative defenses" of "Lack of Subject Matter Jurisdiction" and "Failure to State a Claim," the Court notes that Duke may raise lack of subject matter jurisdiction at any time and may raise failure to state a claim at trial. Fed. R. Civ. P. 12(h)(2)(c) and 12(h)(3). Accordingly, granting summary judgment in Plaintiffs' favor

on these "affirmative defenses" would have no effect, and the Court will recommend denying Plaintiffs' Motion on these grounds.

Based on the foregoing, the Court will recommend that Plaintiffs' Motion for Partial Summary Judgment on Duke's Affirmative Defenses be granted to the extent Duke has abandoned the following affirmative defenses: (3) Fair Use and Descriptive Usages Permitted, (6) Abandonment, (7) Acquiescence and/or Permission, (9) Unclean Hands, (10) Contribution to Damages and Failure to Mitigate, (12) Laches, (14) Preemption, and (17) and Misuse. The Court will recommend that the Motion otherwise be denied.

### E. Plaintiffs' Motion to Exceed Page Limit

Plaintiffs have filed a Motion to Exceed Page Limit [Doc. #174] for their brief in opposition to Duke's Second Motion for Summary Judgment. Duke objected to the failure of Plaintiffs' response brief to comply with the Local Rules' formatting requirements. In their Motion to Exceed Page Limit, Plaintiffs seek to re-file their brief, which, as reformatted in accordance with the Local Rules, exceeds the page limit set out in Local Rule 7.3(d). Duke has not filed a response in opposition to the instant Motion. In the circumstances, the Court will allow Plaintiffs' Motion to Exceed Page Limit, but the Court cautions the Parties that going forward, all documents must comply with the Local Rules or are subject to being stricken.

## IV. CONCLUSION

IT IS THEREFORE RECOMMENDED that Duke University's First and Second Motions for Partial Summary Judgment [Doc. #134 and #150] be denied, that Plaintiffs' Motion for Summary Judgment on all Claims [Doc. #148] be denied, and that Plaintiffs'

Motion for Partial Summary Judgment on Duke's Affirmative Defenses [Doc. #146] be granted in part and denied in part, as discussed herein.

IT IS THEREFORE ORDERED that Plaintiffs' Motion to Exceed Page Limit [Doc. #174] is GRANTED.

This, the 3rd day of June, 2016.

_____/s/ Joi Elizabeth Peake_____
United States Magistrate Judge
